UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

Thomas Smith,                              )
                                           )
    Plaintiff,                             )
                                           )
v.                                         )    No. 15 CV 50208
                                           )    Magistrate Judge Iain D. Johnston
Carolyn W. Colvin, Acting                  )
Commissioner of Social Security,           )
                                           )
    Defendant.                             )

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Thomas Smith brings this action under 42 U.S.C. §405(g), challenging the denial of social security disability benefits.

## **BACKGROUND**

Plaintiff worked as a welder for a number of years. In late 2013, when he was 41 years old, he began experiencing pain and numbness on his right side. After an MRI showed degenerative disc disease, he had spinal surgery (cervical laminoplasty at C3-6), performed by Dr. Christopher Sliva, in the middle of December 2013. Plaintiff returned to work, but kept experiencing problems, causing him to stop working in April 2014. On June 9, 2014, Dr. Sliva operated a second time, performing a cervical discectomy and fusion at C4-5 and C5-6. R. 244. On June 18, 2014, plaintiff filed his disability insurance application. R. 17.

On March 26, 2015, a hearing was held before the administrative law judge ("ALJ"). Plaintiff testified that he completed the ninth grade; that he drove a car once a week; that he lived with his wife and 19-year old son; that his wife worked part-time; that could shower and bathe himself, although he had trouble washing his hair; that he did some chores around the house such as sweeping "a little bit" and picking things off the floor. On a typical day, he would "just try to

1

get comfortable, sit for a little bit, lay down [] on and off, get up and move around." R. 37.

Plaintiff stopped working because he "had pain shooting down [his] right side, and [his] hand was going numb." R. 40. He also had neck pain making it hard to move his head left or right or up or down. This pain emerged after the second surgery. He still had weakness in his right arm and numbness in his fingers, specifically his thumb and index finger, which prevented him from grabbing and holding things, which he needed to do on his welding job. When asked if anything made the pain worse, he stated that the pain "stays about consistent," which he rated as 5 to 5 and 1/2 on a 10-point scale. The pain woke him up at night and he was only able to sleep three or four hours. He was seeing a pain specialist, Dr. Vo, who gave him several injections. Plaintiff was taking Norco three times a day, as well as Lyrica, Cymbalta (antidepressant), and Ambien (sleep medication). The ALJ asked plaintiff about his hands and arms, and he stated that he could lift his arms straight overhead but not in a jumping-jack motion. He had no restrictions on the use of his left arm. He had trouble walking and could only walk a block-and-half without too much trouble. He stated that he could sit comfortably for about 30 to 45 minutes at a time and then would experience pain down his right leg and in the back of his neck.

After plaintiff testified, a medical expert, Dr. Sai Nimmagadda, and a vocational expert ("VE"), Thomas Dunleavy, testified. Relevant portions of their testimony are discussed below.

On April 3, 2015, the ALJ found that plaintiff had the following severe impairments: "degenerative disc disease of the cervical spine status post laminoplasty, foraminotomy, and discectomy with fusion, right upper extremity radiculopathy, cervical spine myelopathy, and cervical spine myloemalacia, and degenerative disc disease of the lumbar spine." R. 15. The ALJ found that plaintiff did not meet any listing and that he had the residual functional capacity ("RFC") to work several jobs. The ALJ's rationales are discussed below.

**DISCUSSION**

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). A reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).

Plaintiff's opening brief is 23 pages, and contains six major arguments. As is often the case, the major arguments contain branching sub-arguments, making the total number greater than six. Also, somewhat confusingly, several arguments re-surface in multiple sections. The net effect is that plaintiff's arguments are interconnected and not always easy to discuss in isolation. After reviewing the briefs, the Court finds that the following arguments justify a remand.

**I.      Neck and Finger Problems.**

Plaintiff raises two similar arguments directed at specific functional limitations included the ALJ's list of RFC limitations. The two at issue are the following:  (i) plaintiff could

3

"frequently finger/feel with the thumb and second finger of the right hand" and (ii) he could "frequently flex and laterally rotate [his] neck." R. 16.[1] Plaintiff asserts that he cannot do these activities "frequently" but only "occasionally" or perhaps not even at all and argues that the ALJ provided only a vague explanation for his conclusion and improperly "played doctor." Plaintiff also complains that the ALJ's reasoning is further obscured by numerous INAUDIBLE markings in the hearing transcript.

The Court begins with the finger problems. To briefly summarize, plaintiff complained about right finger problems when he first visited a doctor sometime around November 2013. R. 267. At the hearing, he testified that he was still suffering from these problems. Dr. Nimmagadda, testified as follows about plaintiff's finger and thumb numbness:

> Q  Okay, because there [are] some physical findings of numbness with the thumb and the finger, is there support for that in the record?
>
> A  I, I – my private feeling is that the involvement of (INAUDIBLE) a finding, but I couldn't find any support for that.
>
> Q  So, there's nothing in the diagnostic tests (INAUDIBLE) to support that?
>
> A  Correct, so mainly the C5 C6 is up there off the upper part of the arm.

R. 57-58. Then a few pages later in the transcript, he gave what appears to be a second answer, testifying as follows:

> A  [R]egarding manipulative limitations, reaching in all directions, [plaintiff] would be limited to occasionally.
>
> Q  With both his shoulders or just one?
>
> A  Just, just the right.
>
> Q  So, occasionally reach all directions, with the right upper extremity?

---

[1] Although not discussed in the briefs, the definition of "frequently" in Social Security law is that the limitation "occurs one-third to two-thirds of an eight-hour workday." POMS, DI 25001.001 Medical-Vocational Quick Reference Guide.

> A Correct.
>
> Q No limitations on the left?
>
> A Correct.
>
> Q Okay.
>
> A And then handling, fingering, and feeling would all be limited.
>
> Q Okay.

R. 60. This answer—that fingering and handling would be "limited"—seems to contradict the earlier answer that there is nothing to support the allegation of right hand problems. Unfortunately, neither the ALJ nor plaintiff's counsel asked any follow-up questions or pointed out that seemingly divergent answers.

In any event, at the end of his questioning of Dr. Nimmagadda, the ALJ summarized plaintiff's RFC limitations in a long list, but left out the limitation on handling and fingering given in the second answer quoted above. R. 61. This raises a question: was this done intentionally or by inadvertence?

This uncertainty was not acknowledged nor resolved in the ALJ's opinion. As noted above, the ALJ in fact included in the RFC formulation the limitation that plaintiff could "frequently finger/feel with the thumb and second finger of the right hand." R. 16. The ALJ explained why in the section of the opinion assessing the weight given Dr. Nimmagadda's testimony. *See* R. 19 ("I find that Dr. Nimmagadda's testimony that the claimant would not possess any handling or fingering limitations is inconsistent with the perpetually diminished strength and sensation in his right hand, specifically in the thumb and second finger of the right hand[.]"). As the latter statement suggests, the ALJ overlooked Dr. Nimmagadda's second answer from the hearing because no attempt was made to resolve the apparent contradiction. In

5

addition to this discrepancy, plaintiff also complains that the ALJ did not explain why he chose this particular limitation (as opposed to one more limiting) and that this conclusion is not supported by any medical opinion. The Court agrees with these arguments and finds that the handling of this one issue—starting with the hearing and carrying over into the opinion—remains clouded with too many unresolved questions.[2]

The Government's main argument is to state that the ALJ included "even more restrictions in the RFC assessment than recommended by Dr. Nimmagadda." Dkt. #29 at 7. But this argument overlooks Dr. Nimmagadda's second answer at the hearing. It also does not address the lack of a medically-supported explanation for picking this particular limitation. The only clue to the ALJ's thinking is his statement that plaintiff had "*perpetually* diminished strength and sensation in his right hand." R. 19 (emphasis added). This statement, however, is so general that it could support an array of opinions, including plaintiff's position that greater hand limitations were warranted. The Government also argues that plaintiff did not have "significant problems" fingering or feeling with his right hand because "he engaged in activities, such as playing video games." Dkt. #29 at 10. But this argument fails because the ALJ never explicitly mentioned it as a reason. *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) ("the *Chenery* doctrine [] forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced").

Similar questions exist regarding plaintiff's neck limitations. At the hearing, Dr. Nimmagadda testified that he did not find that plaintiff had any neck limitations, either rotating

---

[2] To add one more question to the mix, the Court is not clear on Dr. Nimmagadda's explanation given in his first answer. It is conclusory with no supporting evidence, contains an INAUDIBLE marking, and states that the doctor was relying on his "private feeling," a curiously opaque phrase.

6

side to side, or up and down.[3] Despite this fact, the ALJ later included in one of the hypotheticals to the VE the limitation that plaintiff would only be able to "frequently flex the neck, and frequently rotate the neck laterally." R. 67. The VE concluded that this limitation would not change his conclusion that plaintiff's RFC would allow him to work as an assembler, sorter, and visual inspector. The ALJ then asked whether the VE's answer would change if the neck limitations were more severe. Here is this exchange:

> Q  One other question, if I accept the hypothetical I just gave you, number two, and the only thing I changed about it is, that I changed the frequently flexing the neck and frequently rotating the neck bilaterally to occasional, would that change?
>
> A  When you say flexing the neck, Your Honor, what – the jobs I've given are jobs where people are, are looking down as they're working.
>
> Q  Right.
>
> A  And that[] essentially causes a slight movement in the neck as they look down, of course (INAUDIBLE) –
>
> Q  Right.
>
> A  – so it doesn't appear that that's (INAUDIBLE) do, but I just wanted to clarify the job description.
>
> Q  And obviously when people are looking down at their work, they're also able to look up and I assume (INAUDIBLE), correct?
>
> A  Yes.
>
> Q  So the answers would be the same?
>
> A  Yes.

---

[3] His answer consisted of this one-sentence explanation: "I note that on, on Exhibit 12F, that, that – oh, I think it was 14F, that the range of motion was not very restricted on examination, so as far as the objective findings that I find that, that there isn't any limitations." R. 61-62.

7

R. 68. In the opinion, the ALJ imposed a neck limitation of frequent movement, stating: "I find that the diminished range of motion in his neck and his reports of chronic pain would affect the claimant's ability to more than frequently flex and laterally rotate the neck[.]" R. 19.

Plaintiff complains that the confusion in the above exchange raises uncertainty about what the ALJ concluded. The Government responds by claiming that it is all a moot issue because the ALJ did *not* adopt an "occasional" limitation. Plaintiff counters that the VE seemed to be assuming that these jobs would be require looking down on "an almost constant basis" and that the VE's testimony is ambiguous. Dkt. #24 at 16. As plaintiff rhetorically asks his opening brief, "What meaning could flexing the neck have if a limitation to occasional did not preclude jobs that required looking down throughout the workday?" *Id.* This a reasonable question, one deserving an answer. The VE's reference to "slight movement" is also ambiguous. Moreover, as with the finger problems, the ALJ never provided a medically-backed explanation for why he imposed *some* neck limitation but not a *greater* one.

More broadly, both of these two specific arguments implicate another argument, one not fully developed but nonetheless important. Plaintiff argues that the ALJ should have given "very little weight" to Dr. Nimmagadda's opinions because he was "a non-examining physician who does not have any relevant specialty." Dkt #24 at 15. According to plaintiff, and undisputed by the Government, Dr. Nimmagadda specializes in allergy, immunology, pulmonary medicine, and internal medicine, the implication being that he lacks expertise about spinal problems. *Id.* Without explicitly using the phrase, plaintiff is invoking one of the factors under the treating physician rule. Under this rule, a treating physician's opinion is entitled to controlling weight if it is supported by medical findings and consistent with other substantial evidence in the record. 20 C.F.R. §404.1527(c)(2); *Moore v. Colvin*, 743 F.3d 1118, 1127 (7th Cir. 2014). If the ALJ does

8

not give the treating physician's opinion controlling weight, the ALJ cannot simply disregard it without further analysis. *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010). Instead, the ALJ must determine what specific weight, if any, the opinion should be given. *Moss¸* 555 F.3d at 561. To make this determination, the ALJ must apply the checklist of factors set forth in 20 C.F.R. §404.1527(c)(2). *Campbell*, 627 F.3d at 308 (referring to the factors as a "required checklist"); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008).[4] Failure to apply checklist is reversible error. *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (ALJ disregarded checklist).

The ALJ did not reference this rule and clearly did not follow this process in evaluating any of the medical opinions. Plaintiff's argument matches up with the fifth factor—degree of specialization—and plaintiff raises a valid point about Dr. Nimmagadda's expertise given that this case requires navigation through a maze of technical and (to this Court, at least) confusing terminology. It is not just a question of Dr. Nimmagadda's expertise in isolation, but more precisely how it compares to that of the treating doctors. Plaintiff was treated by doctors specializing in the treatment of spinal problems as evidenced by his two spinal surgeries six months apart. The ALJ only provided a cursory analysis of these opinions. Specifically, the ALJ stated as follows: "I also give no weight to the repeated notations that the claimant is 'disabled' in the orthopedic treatment notes[.]" R. 19. The ALJ then offered several reasons for the wholesale rejection of their opinions, one being that they were not familiar with SSA regulations and another being that their comments did not "appear to" relate to claimant's general ability to work but only his ability to work as a welder. *Id.* But this analysis is cursory and was not reached after explicitly applying the checklist. The first two factors (length and

---

[4] These factors are as follows: (1) the length of treatment; (2) the nature and extent of the treatment relationship; (3) the supportability of the medical opinion; (4) the consistency of the opinion with the record as a whole; (5) the physician's degree of specialization; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)(i)-(ii), (c)(3)-(6).

nature of the treatment relationship), for example, would suggest more weight be given to the opinions of these treating doctors. Plaintiff was seen multiple times by his surgeon, Dr. Sliva, who had a more close-up view than did Dr. Nimmagadda.[5] On remand, the ALJ should follow the treating physician rule.

## II. Credibility

Another argument for remand is the ALJ's credibility analysis, which is stated in full as follows:

> While I have considered the claimant's reports of pain and his alleged limitations standing, walking, sitting, and lifting/carrying, his objective examinations note moderate limitations and do not corroborate the severity of those limitations alleged. For instance, he testified that he had no significant relief after the surgery, but the record reflects that he had 90% pain relief by his own admission (Exhibit 8F/4-7) and he revised his testimony to testify that he had experienced some relief. I have considered the claimant and his wife's letter in evaluating his residual functional capacity, but I do not find the level of pain and physical limitations noted therein to be reflected in the orthopedic or pain specialist treatment records, and his objective examinations suggest no more than moderate limitations. The claimant's ability to drive without restrictions is not indicative of the level of deficits alleged[;] he remains capable of helping out around the house on a limited basis, and he exhibits no substantial atrophy or limitations in his dexterity during all of his pain management appointments (Exhibits 8F, 9F). Given all of these factors, I find that his testimony is not fully credible.

R. 19.

Plaintiff argues both that both the specific reasons as well as the overall approach are flawed. An ALJ's credibility determination should be reversed only if it is patently wrong. *Minnick v. Colvin*, 775 F.3d 929, 937 (7th Cir. 2015). However, an ALJ's decision may be reversed if the ALJ "fail[s] to adequately explain his or her credibility finding by discussing specific reasons supported by the record." *Id.*; *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008)

---

[5] The proper application of the treating physician rule should result in the total rejection (*i.e.*, assigning "no weight") of the treating physician's opinion only on rare occasions. *See* SSR 96-2p ("A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and adopted by the adjudicator.").

(a credibility finding "must be specific enough to enable the claimant and a reviewing body to understand the reasoning"). In addition, an ALJ's credibility finding will be reversed if it is based on an error of fact. *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (remanding because the ALJ's credibility determination "misstated some important evidence and misunderstood the import of other evidence"); *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006) (an ALJ may not base a credibility determination on "errors of fact or logic").

One of plaintiff's overarching arguments is that the ALJ violated a fundamental Social Security precept by concluding that plaintiff's subjective pain complaints were not believable because they were not supported by objective evidence. Plaintiff cites to several cases supporting this point.[6] Plaintiff's point is well taken. The first sentence in the above paragraph states that "objective examinations . . . do not corroborate the severity" of plaintiff's subjective allegations. Relatedly, the ALJ discounted plaintiff's wife's statements because her observations about plaintiff's "level of pain" were not "reflected in the orthopedic or pain specialist treatment records." The ALJ's explanation is essentially a tautology. It skirts the relevant question of whether plaintiff's *subjective* pain allegations should be believed *given that* the objective evidence does not provide a definitive answer. As plaintiff notes, if the ALJ's rationale were accepted, then every statement from a family member would be precluded. The Seventh Circuit has rejected such a view. *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) ("Whatever uncertainty may exist around such self-reports is not by itself reason to discount them— otherwise, why ask in the first place?").

---

[6] *See, e.g., Pierce v. Colvin*, 739 F.3d 1046, 1049-50 (7th Cir. 2014) ("an ALJ may not discount a claimant's credibility just because her claims of pain are unsupported by significant physical and diagnostic examination results").

Another overarching credibility argument is that the ALJ failed to explicitly analyze the seven credibility factors in SSR 96-7p.[7] The Government argues that the ALJ *implicitly* considered all the factors. This conclusion is not self-evident. For example, as plaintiff argues, the ALJ seemed to give no consideration to the fact that he "consistently sought treatment for his symptoms including two surgeries on his cervical spine, a trigger point injection, physical therapy, TENS unit treatment, and consistently prescribed narcotic pain medications." Dkt. #24 at 13-14. Contrary to many cases seen by this Court, where the ALJ discounts testimony because only conservative treatments were pursued, plaintiff's doctors concluded relatively early in the process that surgery was required.

Aside from these two overarching arguments, plaintiff raises criticisms about the specific credibility reasons offered by the ALJ. This Court agrees.

**90% Pain Relief Statement.** This statement was given much weight based on the ALJ's multiple citations to it. Plaintiff argues that that the ALJ ignored the fact that this statement concerned only his upper arm pain and did not speak to other problems such as numbness and other areas such as the neck and hand, and the analysis also ignored plaintiff's later reports that the pain returned. Plaintiff has again raised valid points. Although the ALJ's reliance on this statement may not have been sufficient to warrant a remand by itself, given that a remand is already being ordered, the ALJ should give this issue greater scrutiny. What is missing is an analysis into whether this comment was an outlier, based on a single visit, or whether it reflected a consistent improvement over time. There is some support in the record for plaintiff's claim that his pain had not permanently gone away, as evidenced by (among other things) his referral

---

[7] The seven factors are: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of medication; (5) treatment, other than medication, taken to relieve pain; (6) any measures other than treatment used to relieve pain; and (7) any other factors concerning functional pain limitations. SSR 96-7p.

to a pain specialist who, insofar as this Court can tell, did not doubt his claims of ongoing severe pain. Also, the 90% statement should be viewed in the overall context of the report from which it was taken. To illustrate, the Court will quote the statement along with adjacent portions of Dr. Vo's report:

> **HPI Comments:** [Plaintiff] is s/p Cervical decompression and fusion by Dr. Sliva twice with the most recent one in June of this year for radicular pain in the right upper limb. He had 90% right arm pain relief from the above procedure. However, he has experienced axial neck pain since the above operation.
>
> **Neck Pain**
> This is a chronic problem. The current episode started more than 1 month ago. The problem has been unchanged. The pain is present in the midline (He also has radicular pain down the right upperlimb). The quality of the pain is described as stabbing and burning. The pain is at a severity of 6/10. Associated symptoms include numbness (right arm with Cervical flexion) and weakness (right upper limb). Pertinent negatives include no chest pain or fever.

R. 389. It is not clear whether the ALJ considered this context, which seems to undermine the force of the one statement when viewed in isolation.

**Driving Without Restriction.** Plaintiff complains that the ALJ misleadingly concluded that plaintiff's driving ability proved that he could work a full-time job. At issue is the following sentence from the opinion: "The claimant's ability to drive without restrictions is not indicative of the level of deficits alleged." R. 19. The Court agrees with plaintiff that the ALJ's statement is arguably an unfair characterization of the record. At the hearing, the plaintiff stated that he only drove once a week to his father's house, a four-mile trip, where he would sit with his father him while his stepmom went to church. The ALJ asked plaintiff whether he had a driver's license and whether he had "[a]ny restrictions on it." R. 35. Plaintiff stated that there were none. However, in the opinion, the ALJ omits this context and re-casts this more technical answer into a broader statement about plaintiff's difficulties and pain while driving. Also, the ALJ did not discuss plaintiff's other statements about his driving, such as the following statement made on a Daily

13

Function Report: "I drive *only* short distance [because] *it's hard for me to move my neck to look around.*" R. 204 (emphasis added). The ALJ should acknowledge this counter-evidence on remand.

**Helping Around the House.** Similarly, plaintiff argues that the ALJ overstated his abilities around the house and glossed over contrary evidence, such as his "trouble washing his hair by himself" and that he is "limited to microwave meals, does not do laundry, and most of his day is spent sitting for a little while, laying down for awhile and generally trying to stay as comfortable as possible." Dkt. # 24 at 12. As the Seventh Circuit has noted, a claimant often can perform household activities under a more flexible standard and then such activities are typically judged by a lower standard of performance. *See Bjornson*, 671 F.3d at 647 (the "failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases."). Again, the Court finds that this one issue likely would not be enough to justify a remand by itself, but the ALJ should still consider this evidence more completely on remand.

**No Substantial Muscle Atrophy.** Plaintiff complains that the reference to lack of "substantial atrophy" was both a mischaracterization of the record and an instance of "playing doctor." This Court agrees. The ALJ's assertion is vague and is not supported by specific evidence. As plaintiff summarizes in his opening brief, there is evidence that he had muscle atrophy, decreased strength, and other problems. *See* Dkt. # 24 at 13 (citing R. 308, 390-401). As for playing doctor, the ALJ did not point to any medical opinion or authority supporting the implied premise of this argument—namely, that a person with no substantial muscle atrophy would not have severe pain or numbness. The ALJ cannot merely rely on his own intuitions

14

about what medical findings mean. As noted above, plaintiff was treated by several doctors, including Dr. Sliva, whose observations received only fleeting attention in the opinion.

For all the above reasons, the Court finds that the ALJ's credibility analysis is not sufficient. Having found that a remand is required, the Court need not analyze plaintiff's remaining arguments, which in general are less convincing and less developed than the above arguments in any event. Indeed, these are the types of kitchen sink arguments that good appellate advocacy and editing should eliminate. Motions for leave to file briefs in excess of the page limit will not be granted in the future when it results in unnecessary appellate issues. In remanding this case, this Court is not suggesting that any particular result should be reached.

## CONCLUSION

For these reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and this case is remanded for further consideration.

Date: January 11, 2017     By: _____
                                                     Iain D. Johnston
                                                     United States Magistrate Judge